IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRIAN CHEUVRONT,                )    Case No. 5:19-cv-00360
                                )
          Plaintiff,            )    MAGISTRATE JUDGE
                                )    THOMAS M. PARKER
          v.                    )
                                )
COMMISSIONER OF                 )    **MEMORANDUM ORDER**
SOCIAL SECURITY,                )    **AND OPINION**
                                )
          Defendant.            )

## I.    Introduction

Plaintiff, Brian Cheuvront, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 11. Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence at Steps Two, Four, and Five, and because any error at Step Three was forfeited or harmless, the Commissioner's final decision denying Cheuvront's applications for DIB and SSI must be AFFIRMED.

## II.     Procedural History

On August 6, 2015, Cheuvront applied for DIB and SSI.  (Tr. 367-76).[1]  Cheuvront alleged that he became disabled on June 27, 2015 due to "multiple sclerosis, heart condition (stents), diabetes, back (surgery), numbness in leg as result, club[bed] foot, sleep apnea, [and a] blood disorder."  (Tr. 397).  The Social Security Administration denied Cheuvront's applications initially and upon reconsideration.  (Tr. 224-75).  Cheuvront requested an administrative hearing.  (Tr. 311-12).  ALJ Gregory Beatty heard Cheuvront's case on August 31, 2017, and denied the claim in a November 8, 2017, decision.  (Tr. 17-34, 174-211).  On October 17, 2018, the Appeals Council granted Cheuvront's request for review, proposed that it would adopt the ALJ's finding that Cheuvront was not disabled, and invited Cheuvront to submit additional evidence and comments.  (Tr. 362-66).  Cheuvront submitted additional evidence but did not submit any comments.  (Tr. 4).  On December 19, 2018, the Appeals Council reviewed Cheuvront's case, adopted the ALJ's decision in full, with additional commentary, and denied Cheuvront's claims.  (Tr. 4-8).  On February 18, 2019, Cheuvront filed a complaint to seek judicial review of the Commissioner's decision.[2]  ECF Doc. 1.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Cheuvront was born on May 20, 1974.  (Tr. 26).  He was 41 years old on the alleged onset date and 43 years old on the date of the ALJ's decision.  (Tr. 26, 28).  Cheuvront graduated from high school, and he was able to communicate in English.  (Tr. 27).  He had previous work as a bending machine operator; however, the he was no longer able to perform any of his past

---

[1] The administrative transcript is in ECF Doc. 10.
[2] Because the Appeals Council has reviewed the ALJ's decision, the court must review the Council's opinion (along with any relevant portions of the ALJ's opinion that it adopted) as the final decision of the Commissioner.  *See Mullen v. Brown*, 800 F.2d 535, 538 (1986) (en banc).

relevant work and transferability of skills was irrelevant to the Commissioner's decision. (Tr. 26-27).

### B. Relevant Medical Evidence

On September 9, 2013, Cheuvront saw Toni King, MD, for a diabetes checkup. (Tr. 688-90). Dr. King noted that Cheuvront was compliant with his treatment, which gave him good control of his symptoms. (Tr. 688). Cheuvront denied any extremity pain or numbness, but said that he had back pain, joint stiffness, decreased memory, headaches, poor balance, tremors, weakness, and tingling. (Tr. 689). On examination, Dr. King noted that Cheuvront had normal gait, station, and posture. (Tr. 690). He had resting hand tremors, but no tremors with an outstretched hand. (Tr. 690). Dr. King directed Cheuvront to continue monitoring his blood sugars and using insulin. (Tr. 690). At follow-ups on February 3, June 30, and October 27, 2014, Dr. King did not note any significant changes in Cheuvront's condition or treatment, except that in October he had an additional diagnosis of deep vein thrombosis and reported feeling tired. (Tr. 675-77, 680-82, 684-86). On April 13, 2015, Dr. King noted that she was concerned about Cheuvront's ability to control his glucose levels and recommended taking an insulin dose at lunchtime. (Tr. 671). Cheuvront reported difficulty breathing on exertion, decreased exercise tolerance, back pain, decreased memory, and some numbness/tingling. (Tr. 672). Nevertheless, Dr. King's examination findings remained generally the same, she continued his medications, and she recommended physical therapy and dieting for weight loss. (Tr. 673-74). At follow-ups on May 11, August 18, and November 11, 2015, and March 8, 2016, Dr. King noted some improvement in Cheuvront's ability to control his glucose levels, but also noted that he continued to have periods of hypoglycemia. (Tr. 662-67, 788-90, 792-94). Dr. King recorded that Cheuvront had gained 20 pounds following the March 2016 examination, but his condition otherwise remained generally the same. (Tr. 789-90). On July 6, 2017, Dr. King

noted that Cheuvront reported neurological tingling and weakness and said that he had been taking his insulin 2 hours after his meals without explanation. (Tr. 1019). On examination, he had no noted cardiovascular or musculoskeletal issues, normal memory, and well-controlled hypertension. (Tr. 1022). Dr. King recommended regular aerobic exercise, continued his medications, and directed him to take his insulin with his meals. (Tr. 1022).

From November 4, 2013, through June 5, 2017, Cheuvront saw Laura Zelasko, CD, for a total of 44 chiropractic sessions to treat his back pain. (Tr. 724-32, 912-18, 1089-93). On October 10, 2015, Dr. Zelasko wrote a letter, stating that she had treated Cheuvront for acute pain in his back, numbness in his leg, multiple sclerosis, diabetes, club foot, and neck pain. (Tr. 722). Dr. Zelasko said that Cheuvront's "response to treatment has been favorable in the respect that he receives relief from symptoms and improved function." (Tr. 722). Nevertheless, Dr. Zelasko said that Cheuvront's relief was only temporary, and that she did not think he would recover from his permanent conditions. (Tr. 722).

On November 27, 2013, Cheuvront told Miriam Zidehsarai, DO, that he'd had diabetes mellitus for nine years, six cardiac stents placed in 2009, blood in his urine, and kidney stones. (Tr. 477). On examination, Dr. Zidehsarai noted that Cheuvront was alert, oriented, well-nourished, and well-developed. (Tr. 478). She diagnosed Cheuvront with chronic kidney disease. (Tr. 478). At follow-ups on March 10, 2014, and March 12, 2015, Dr. Zidehsarai noted that Cheuvront's kidney disease was stable, and that he was alert, oriented, and had a normal gait. (Tr. 478, 483).

On March 17, 2014, Roswell Dorsett, DO, noted that Cheuvront's multiple sclerosis was stable, he had diabetic neuropathy, and he was in stage one renal failure but had no new symptoms or exacerbations. (Tr. 472). On examination, Dr. Dorsett noted that Cheuvront was

alert and oriented; had no tremors; and had normal attentiveness, memory, muscle tone, strength, coordination, gait, reflexes, and sensation. (Tr. 472).

On May 28, 2014, Cheuvront saw Heather Thomas, MD, for treatment of his hypertension and diabetes. (Tr. 492). Cheuvront told Dr. Thomas that he was working on his diet, described himself as "active," and said that he regularly walked for exercise. (Tr. 492-93). Cheuvront complained of fatigue, but denied any dizziness, weakness, gait disturbance, and imbalance. (Tr. 492-93). On examination, Dr. Thomas noted that Cheuvront had a normal gait and normal station, and she prescribed Crestor for Cheuvront's high cholesterol. (Tr. 496).

On June 19, 2014, Howard Minott, MD, treated Cheuvront for a kidney stone. (Tr. 612). Cheuvront said that he did not have any pain, including no back pain, and that he had a history of passing kidney stones. (Tr. 612). Dr. Minott noted that Cheuvront's hypertension was well-controlled, his diabetes was stable, and his kidney stones were stable. (Tr. 612). On examination, Dr. Minott noted that Cheuvront's back appeared within normal limits and he had normal gait, station, range of motion, muscle strength, and digits. (Tr. 614). Dr. Minott did not recommend any medical interventions and scheduled a follow-up appointment. (Tr. 616). At a follow-up on August 4, 2015, Cheuvront reported a kidney stone, without abdominal or low back pain. (Tr. 619). Dr. Minott again noted that all of Cheuvront's conditions were stable and recommended continued observation without intervention. (Tr. 620, 622).

On July 5, 2014, Cheuvront went to the emergency room due to "redness" and pain in his left leg. (Tr. 634). Cheuvront rated his pain as a 5/10 and said that it lasted throughout the day. (Tr. 634). On examination, John Robinson, DO, noted that Cheuvront had inflamed hematoma or varicosity, but his muscle strength, sensation, and reflexes were intact. (Tr. 635). Dr. Robinson diagnosed Cheuvront with phlebitis and possible cellulitis and gave Cheuvront a

rule-out diagnosis of deep vein thrombosis.  (Tr. 635).  He prescribed Ultram, Naprosyn, Keflex, and Lovenox.  (Tr. 635).

On July 6, 2014, Saneka Chakravarty, MD, took a venous duplex image of Cheuvront's left leg.  (Tr. 525, 568, 644).  Dr. Chakravarty found that there was an acute thrombosis in Cheuvront's left leg, but his other veins were patent and there was no evidence of deep vein thrombosis.  (Tr. 525, 568, 644).

On July 9, 2014, Dr. Thomas noted that Cheuvront's symptoms had not improved or worsened since his July 5 emergency room visit.  (Tr. 497).  Cheuvront told Dr. Thomas that he was active and regularly walked for exercise, and Dr. Thomas noted that Cheuvront's various medical conditions were controlled through medication.  (Tr. 498-99).  On examination, Dr. Thomas noted that Cheuvront had a normal gait and station.  (Tr. 499).  Dr. Thomas recommended that Cheuvront take 600mg of ibuprofen 3 times per day, use a warm compress and elevation on his leg, and go to the emergency room if he had chest pain, dyspnea, or hemoptysis.  (Tr. 500).

On July 10, 2014, Cheuvront went to the emergency room because pain and "redness" in his left leg had spread and gotten worse.  (Tr. 636).  Katherine Bulgrin, DO, noted that a venous doppler study showed increasing thrombophlebitis, which could develop into deep vein thrombosis, but there was no deep vein thrombosis at the time.  (Tr. 636-37).  Dr. Bulgrin schedule Cheuvront for an ultrasound of his leg, from which Badr Ghumrawi, MD, later determined that there was no evidence of deep vein thrombosis but there was a thrombus in Cheuvront's left saphenous vein.  (Tr. 527-28, 570-71, 642-43).

On July 17, 2014, Dr. Thomas noted that Cheuvront had a large blood clot in his leg and pain in his leg and back, for which he was taking ibuprofen.  (Tr. 501).  Cheuvront denied dizziness, weakness, and gait issues, and he said that he was active and walked regularly for

exercise.  (Tr. 502).  On examination, Dr. Thomas noted that Cheuvront's gait and reflexes were normal, and she prescribed him Mobic for his pain.  (Tr. 504).

On August 4, 2014, Cheuvront told Saif Ur Rehman, MD, that he had swelling in his left leg and was diagnosed with deep vein thrombosis.  (Tr. 563).  Dr. Rehman noted that Cheuvront was "not very active," overweight, and 'sometimes" had "lower back pain."  (Tr. 563).  On examination, Dr. Rehman noted that Cheuvront had stable vitals, normal heart rhythm, and some swelling in his extremities, but he did not have any tenderness and he had normal neurological functioning.  (Tr. 563).  Dr. Rehman prescribed coumadin and indicated that Cheuvront might not need Lovenox.  (Tr. 567).  On December 5, 2014, Cheuvront followed-up with Dr. Thomas, who noted that Cheuvront would likely be on Coumadin for the rest of his life and also prescribed him a statin for hyperlipidemia.  (Tr. 505, 511).  At a follow-up on August 18, 2014, Dr. Rehman noted that Cheuvront was functioning within normal limits.  (Tr. 567).  On November 10, 2014, and January 19, April 13, July 6, and September 24, 2015, Dr. Rehman noted that Cheuvront was "doing very well," denied complaints, had stable vitals/cardiac function, and no longer had swelling or edema in his extremities.  (Tr. 560, 567, 855).

On December 10, 2014, Roger Tsai, MD, noted that Cheuvront had five coronary stents placed in 2010, took coumadin for deep vein thrombosis, and complained of intermittent chest pain with activity, but he had stable blood pressure and a normal EKG.  (Tr. 556-57).  Cheuvront also said that he had occasional, intermittent tingling in his hand and arm, that he saw a chiropractor for back pain, and that he had pain and memory issues due to multiple sclerosis.  (Tr. 556-57).  On examination, Dr. Tsai noted that Cheuvront had regular heart rhythm and sounds, no motor or sensory deficits, no swelling, and appropriate mood, memory, and judgment.  (Tr. 557).  Dr. Tsai diagnosed Cheuvront with arteriosclerotic heart disease, continued his medications, and scheduled a stress test to determine if additional cardiac catheterization was

necessary. (Tr. 557). Khaled Sleik, MD, conducted the stress test on December 12, 2014, and found normal results, no significant chest pain, and normal blood pressure; however, there was a "small area of ischemia" with normal left ventricular function. (Tr. 536-37, 639, 648). Dr. Sleik also found "excellent perfusion" in all major segments, except the apex which had a mild reversible perfusion defect. (Tr. 648). A follow-up EKG on December 18, 2014, showed no significant changes in Cheuvront's condition. (Tr. 538).

On January 7, 2015, Heather Cope, CNP, treated Cheuvront for hyperlipidemia, hypertension, and deep vein thrombosis. (Tr. 539). Cheuvront told Cope that his chest pain had persisted for two months despite medication, but it resolved with rest. (Tr. 539-40). Cheuvront also said that he had some tingling in his left arm and dyspnea when climbing stairs, but he did not have any dizziness or extremity swelling. (Tr. 540). Cheuvront also reported nerve pain, memory issues, and back pain. (Tr. 540). Cheuvront said the he followed a heart-healthy, low-sodium diabetic diet, exercised for 20 minutes on a stationary bike every 3 to 4 days, and walked on occasion. (Tr. 540). On examination, Cope noted a regular heart rhythm, no edema, appropriate mood and memory, and no gross motor or sensory deficits. (Tr. 540). Cope diagnosed Cheuvront with coronary artery disease, recurrent deep vein thrombosis, hypertension, and hyperlipidemia. (Tr. 540-41). She prescribed medications for all of Cheuvront's conditions and recommended that he continue a healthy diet and exercise. (Tr. 541). On April 7, 2015, Cope did not note any significant changes in Cheuvront's condition and noted that different medications might be needed if his chest pain continued. (Tr. 542-44). On June 8, 2015, Cheuvront complained that his medication gave him headaches and he continued having chest pain, and Cope added Ranexa to his medications. (Tr. 517-23).

On March 28, 2015, Cheuvront told Robert Eberlein, MD, that he had pain in his left thumb due to over-use from holding a comb and other objects while cutting hair. (Tr. 640, 742).

Cheuvront said that his thumb sometime swelled, but he had no tingling in his other fingers, no tenderness in his wrist/hand, and good sensation in all fingers. (Tr. 640-41, 742-43). He had some pain in his hand on palpation. (Tr. 640-41, 742-43). Dr. Eberlein diagnosed Cheuvront with de Quervain's tenosynovitis, recommended NSAIDs and decreased use, and recommended that Cheuvront follow up with his primary care doctor about his high blood pressure. (Tr. 641, 743). Cheuvront followed-up with Dr. Thomas on April 3, 2015. (Tr. 511-17). Dr. Thomas noted that Cheuvront's thumb pain and swelling got worse, but that Norco helped. (Tr. 512). Dr. Thomas noted "slightly limited" range of motion in his hand due to discomfort, prescribed tramadol, and referred Cheuvront to an orthopedist. (Tr. 516). Cheuvront saw orthopedist Matthew Kay, MD, on April 20, 2015. (Tr. 714-18). He said that his thumb pain radiated through his wrist, rated it as a 3/10, and said that his prescription medication from the emergency room had helped. (Tr. 714). On examination, Dr. Kay noted that Cheuvront's range of motion was intact, his wrist was stable and nontender, and he had a mildly tender thumb. (Tr. 716). He said that Cheuvront's exam was inconsistent with a de Quervain's diagnosis, prescribed a thumb splint, and said that medications could be necessary if symptoms recurred. (Tr. 716).

On June 5, 2015, Cheuvront told Dr. Thomas that he continued to have cardiac issues and chest pain, and that he had to switch medications due to his insurance coverage. (Tr. 518). He told Dr. Thomas that he was active and walked regularly for exercise, and Dr. Thomas noted that he had a normal gait, station, and cardiac exam. (Tr. 519, 521). Dr. Thomas continued Cheuvront's treatment through medication. (Tr. 523).

On August 25, 2015, Cheuvront told Erin Dean, MD, that he had pain in his left foot, related to his clubbed foot, and asked to be fitted or brace shoes. (Tr. 708). Cheuvront denied numbness, tingling, swelling, and weakness. (Tr. 708). On examination, Dr. Dean found that Cheuvront had a normal gait on the right side and antalgic gait on the left side, his midfoot was

collapsed, and he had normal alignment in his ankle and hindfoot. (Tr. 710-11). Dr. Dean fit Cheuvront for a brace and discussed a steroid injection. (Tr. 712). On October 6, 2015, Cheuvront told Dr. Dean that he felt good support and no pain with his foot/ankle brace; however, he said that he felt his brace was pulling on the side of his foot. (Tr. 703). Dr. Dean recommended a fluoroscopic guided injection and educated Cheuvront on stretching for Achilles tightness. (Tr. 707).

On October 9, 2015, Cheuvront went to the emergency room because he had aching back pain after doing some yard work the day before. (Tr. 740, 863). Cheuvront told Michael Baumgardner, DO, that he had generalized muscle pain in his upper extremities with movement, but he denied headaches and chest pain. (Tr. 740, 863). Cheuvront said that he was compliant with his medications and that he was able to control his back pain for years by seeing a massage therapist and a chiropractor. (Tr. 740, 863). On examination, Dr. Baumgardner noted that Cheuvront had full range of motion, could walk heel-to-toe, had an antalgic gait without foot drop or weakness, had normal muscle strength and reflexes, and had appropriate judgment. (Tr. 741, 864). Dr. Baumgardner diagnosed Cheuvront with acute exacerbation of chronic lumbar back pain and prescribed tramadol. (Tr. 741, 864). Cheuvront followed up with Dr. Thomas on October 16, 2015. (Tr. 751-57). Cheuvront said that he had intermittent tingling in his arms, did not improve with tramadol, and his insurance no longer covered his massage therapy. (Tr. 751). On examination, Dr. Thomas noted some limited range of motion in his back, referred him for physical therapy, and extended his tramadol prescription. (Tr. 756).

On October 16, 2015, Cheuvront went to the emergency room for low blood sugar and vomiting. (Tr. 737-39, 861-62). After his arrival in the emergency room, Cheuvront told Dr. Bulgrin that he felt improved, and he was able to answer questions appropriately. (Tr. 738, 861). On examination, Cheuvront's back and legs were nontender, he had no swelling in his

legs, and he had full strength and sensation in all his extremities. (Tr. 738, 861). Cheuvront was discharged in a stable condition, with instructions to hold his insulin for the rest of the day and resume his normal schedule the next day. (Tr. 738, 862).

On December 8, 2015, Cheuvront told Dr. Thomas that physical therapy did not help and requested that his medications be refilled. (Tr. 758, 824). Dr. Thomas continued Cheuvront's medications and ordered a lumbar x-ray. (Tr. 763, 830). Yun Sheu, MD, took the x-ray on December 11, 2015, and found no acute fracture or listhesis of the lumbar spine; however, there were lateral marginal osteophytes at L2-L3 and facet arthrosis at L5-S1. (Tr. 868).

On December 14, 2015, Cheuvront told Dr. Tsai that his chest pain had totally resolved with low-dose Ranexa and that he felt well. (Tr. 767). Cheuvront said he sometimes had back problems, for which he saw a chiropractor. (Tr. 767). On examination, Dr. Tsai found that Cheuvront had no edema in his extremities and appropriate mood, memory and judgment. (Tr. 768). Dr. Tsai continued Cheuvront's medications. (Tr. 768). On December 20, 2016, Dr. Tsai noted that an AK showed no changes from Cheuvront's previous visit and that Cheuvront denied chest pain, shortness of breath, feeling poorly, tiredness, and joint pain/stiffness. (Tr. 1102, 1105). He also denied any tingling, numbness, headaches, confusion, memory loss, and anxiety. (Tr. 1105). On examination, Dr. Tsai found that Cheuvront's recent and remote memory were intact and he continued Cheuvront's medications. (Tr. 1106).

On January 12, 2016, Cheuvront told Dr. Rehman that he had chronic pain (chest and lower back) and anxiety. (Tr. 852). On examination, Dr. Rehman found no edema or tenderness, normal heart rhythm, deep vein thrombosis, and hypertension. (Tr. 853). Dr. Rehman prescribed medication to better control Cheuvront's symptoms and recommended that Cheuvront take aspirin and dietary supplements. (Tr. 853). At follow-ups on June 14, 2016,

and June 27, 2017, Dr. Rehman noted that Cheuvront was "doing very well" with his treatment and had no complaints, and Dr. Rehman continued his medications. (Tr. 847-48, 1160-62).

On January 13, 2016, Douglas Ehrler, MD, evaluated Cheuvront's lower back pain. (Tr. 777). Cheuvront said that he had stabbing pain in his lower back, which radiated down his legs, and that he had a history of failed physical therapy sessions. (Tr. 777). Cheuvront said his symptoms were worse with lifting, bending, walking, sitting, standing, changing positions, and extended inactivity. (Tr. 777). On examination, Dr. Ehrler found that Cheuvront had a normal gait on his left and right, did not use assistive devices, and had a balanced and upright posture. (Tr. 779). Dr. Ehrler diagnosed Cheuvront with degenerative disc disease of the lumbar spine with radiculopathy to the leg, recommended "nonoperative treatment," and scheduled Cheuvront for an MRI. (Tr. 780). Radiologist William Taylor, MD, took Cheuvront's MRI on January 29, 2016, and found normal alignment with some "large marginal osteophytes" indicating early degenerative changes in the lumbar spine. (Tr. 867, 940).

On March 20, 2016, Cheuvront went to the emergency room for low blood sugar. (Tr. 859-60, 931-32). Cheuvront said that he woke up with blood sugar in the 120s to 130s, took insulin, ate, went to church, and then his blood sugar dropped to 33. (Tr. 859, 931). Cheuvront was discharged in a stable condition and Dr. Baumgardner prescribed him Zofran and recommended follow-up with Dr. Thomas. (Tr. 860, 932).

On June 7, 2016, Dr. Thomas noted that Cheuvront did not get blood work/labs done as he was supposed to do, and that he requested a referral to a new neurologist to treat his multiple sclerosis. (Tr. 805). Cheuvront denied any cardiovascular issues, dizziness, headaches, weaknesses, or gait disturbances. (Tr. 806). On examination, Dr. Thomas noted that Cheuvront had a normal heart function, gait, and station. (Tr. 809-10). Dr. Thomas refilled Cheuvront's medications and referred him to a neurologist. (Tr. 811). At a follow-up on October 28, 2016,

Cheuvront said that he had hip pain and depression, and Dr. Thomas referred him to physical therapy and prescribed Zoloft. (Tr. 973-79). At a follow-up on December 14, 2016, Cheuvront told Dr. Thomas that his Zoloft had helped him a lot. (Tr. 965).

On June 29, 2016, Cheuvront told Martha Passek, CNP, that he took aspirin and Eliquis for deep vein thrombosis, and that he had ongoing chronic chest pain especially when doing yard work. (Tr. 796, 1097). Passek noted that Cheuvront had improved since starting Ranexa and Imdur, and that he denied feeling poorly or tired. (Tr. 796, 798, 1197, 1199). On examination, Cheuvront had a normal gait and heart function. (Tr. 799-800, 1100-01).

On August 31, 2016, Stacy Martin, DPM, found that Cheuvront had a painful left hallux, unmanageable toenails, and swelling in his toes. (Tr. 1219). Cheuvront denied weakness, joint swelling, difficulty walking, pain after inactivity, stiffness, numbness, tingling, headaches, memory loss, and chest pain. (Tr. 1220). On examination, Dr. Martin noted an "abnormal" range of motion in his right and left feet. (Tr. 1220-21). She prescribed physical activity and diet to promote weight loss. (Tr. 1220).

On September 27, 2016, Cheuvront told Charles Zollinger, MD, that he'd had numbness for a year, which he treated with massage therapy, and that he had trouble with his left side due to cerebral palsy, vertigo, and chronic back pain. (Tr. 922). On examination, Cheuvront was alert and oriented and had a regular heart rhythm, normal memory, abnormal strength in his extremities, spastic hemiplegia, left side weakness, no tremors/involuntary movements, normal sensation, and a limp. (Tr. 924). Dr. Zollinger diagnosed Cheuvront with multiple sclerosis and numbness, continued his medications, and ordered an MRI. (Tr. 925-26). Mike Coffey, MD, took the MRI on November 3, 2016, and noted a dumbbell shaped lesion on the T2-T3 area, suggesting a nerve sheath tumor. (Tr. 933-34, 988-89, 1031-32). Dr. Coffey also noted "scattered white matter changes" in Cheuvront's brain. (Tr. 935-36, 990-91, 1032-33). Dr.

Zollinger reviewed the MRI results on November 4, 2016. (Tr. 1007-10). Dr. Zollinger determined that Cheuvront had mild to moderate periventricular white matter disease in his brain, which had remained unchanged over 15 years, and a tumor on his spine. (Tr. 1007). Dr. Zollinger referred Cheuvront for spine surgery and continued his medications. (Tr. 1009-10).

On November 7, 2016, Nicholas Bambakidis, MD, evaluated Cheuvront for spinal surgery, and noted that Cheuvront did not have any pain or numbness in his back. (Tr. 1226). Dr. Bambakidis recommended a debulking surgery and performed the surgery on November 21, 2016, without complications. (Tr. 955-56, 960-61, 1037-40, 1095, 1227, 1229-31). Dr. Bambakidis sent the removed portion of the tumor for testing. (Tr. 955-56). On November 24, 2016, Dr. Bambakidis noted that Cheuvront showed expected post-operative changes, and that his pain remained controlled and that his course of recovery was uncomplicated. (Tr. 952, 1044, 1236). Dr. Bambakidis discharged Cheuvront with instructions to drive and bear weight only as tolerated; slowly increase activity level; and avoid pushing, pulling, or lifting objects greater than 10 pounds until the follow-up visit. (Tr. 952). On January 5, 2017, Dr. Bambakidis referred Cheuvront to radiology for further treatment of the remaining portion of his tumor. (Tr. 1051, 1208, 1239). Cheuvront told Dr. Bambakidis that he was doing well, but his shoulder was sore. (Tr. 1051, 1208, 1239). On examination, Cheuvront had a normal gait and station, intact sensation, normal reflexes, normal range of motion, and full strength. (Tr. 1051-52, 1208-09, 1239-40). Dr. Bambakidis said that Cheuvront was "Ok to return to work and exercise." (Tr. 1052, 1209, 1240).

On January 6, 2017, Christine Suchan, CNP, noted that Cheuvront was not taking his insulin appropriately and recommended that he take it 20 to 30 minutes before his meals. (Tr. 1013). Cheuvront told Suchan that he did not have any chest, back, neck, or joint pain, but he had some dizziness, tingling and headaches. (Tr. 1013). On examination, Suchan found that

Cheuvront had a normal heart rate and sounds, no edema, no deformities in his feet, a normal gait, and a normal memory.  (Tr. 1016).  Suchan continued Cheuvront's medications and recommended regular aerobic exercise.  (Tr. 1017).

On January 13, 2017, Cheuvront told David Mansur, MD, that he did not have any back pain or weakness, but he had some numbness in his hands from his multiple sclerosis and left-side weakness from cerebral palsy.  (Tr. 1054, 1166).  Cheuvront said that he had some stiffness in his back after his surgery.  (Tr. 1054, 1166).  He denied swelling, memory changes, and gait issues.  (Tr. 1055, 1167).  On examination, Dr. Mansur noted that Cheuvront had full strength in his upper and lower extremities and intact sensation.  (Tr. 1055, 1167).  Dr. Mansur recommended that Cheuvront continue with radiotherapy for his tumor and monitor his condition with MRIs.  (Tr. 1156, 1168).  On February 28, 2017, Cheuvront had an MRI that showed an unchanged mass in his spine.  (Tr. 1058-62, 1163-65).  Cheuvront reported numbness in his back near the surgical site but said that he felt well.  (Tr. 1059, 1164).  On April 7, 2017, Dr. Mansur noted that Cheuvront had tolerated his radiation therapy well and scheduled a follow-up session.  (Tr. 1063, 1193).

On February 21, 2017, Cheuvront told Ryan Drake, DO, that he continued to have numbness in his leg and was undergoing radiation therapy for the tumor mass that could not be removed during surgery.  (Tr. 1002).   On examination, Dr. Drake noted that Cheuvront had normal attention, concentration, motor strength, gait, and station.  (Tr. 1004-05).  Dr. Drake continued Cheuvront's medications.  (Tr. 1004-05).

On May 9, 2017, Cheuvront told Dr. Zollinger that he had continued discomfort and pain from his tumor surgery site.  (Tr. 997).  Cheuvront also reported twitching and numbness in his arms and denied trying physical therapy after his surgery.  (Tr. 997).  On examination, Dr. Zollinger noted no tremors/involuntary movement and a normal gait and station.  (Tr. 999).  Dr.

Zollinger increased Cheuvront's Neurontin prescription to treat his surgery-related pain. (Tr. 999). At a follow-up on June 20, 2017, Dr. Zollinger noted that an MRI showed no measurable changes in his brain and that his spine was within normal limits. (Tr. 992); *see also* (Tr. 984-87, 1065-66) (MRI results). Cheuvront reported increased numbness in his arms and hands, which gabapentin did not help; however, monthly massages helped his pain. (Tr. 992). Dr. Zollinger continued Cheuvront's medications and recommended that he continue massages. (Tr. 995-96).

On June 12, 2017, Cheuvront told Nurse Passek that he did not have any significant chest pain or edema, but he had ongoing discomfort in his back after surgery. (Tr. 1067, 1108, 1203). Cheuvront denied any joint pain, muscle pain, weakness, and tiredness. (Tr. 1069, 1111, 1205). On examination, Passek found that Cheuvront had a normal gait and normal heart function, and she continued his medications. (Tr. 1070, 1112, 1206). Passek also encouraged Cheuvront to lose weight and maintain a healthy diet. (tr. 1070, 1112, 1206).

### C.    Relevant Opinion Evidence

#### 1.    Physical Therapist Evaluations

On May 6, 2014, Ryan Tessen, PT, completed a "physical work performance evaluation" to assess Cheuvront's functional abilities. (Tr. 651-58). Tessen determined that Cheuvront's functional abilities fell within the light range. (Tr. 651). He found that Cheuvront could lift up to 20 pounds occasionally and 10 pounds frequently, and that he could apply a negligible amount of force constantly to move objects. (Tr. 651). He needed to alternate between standing, walking and other tasks throughout the day, and he could constantly handle, finger, reach, and feel. (Tr. 651-52). He could occasionally stand, work with arms over his head, bend, stoop, kneel, squat repetitively, walk, climb ladders, and rotate; frequently climb stairs; and never squat, crouch, or crawl. (Tr. 654).

On August 9, 2017, Patricia Schroeder, OTR/L, completed a physical work performance evaluation. (Tr. 1118-25). Schroeder found that Cheuvront could: (1) frequently sit, stand, work with arms over his head, work bent over, kneel, climb stairs, walk, and rotate; (2) occasionally floor to waist lift 42 pounds, waist to eye lift 32 pounds, carry 32 pounds, push 45 pounds, pull 37 pounds, and squat repetitively; and (3) never work while squatting/crouching, crawl, and climb a ladder. (Tr. 1121).

### 2. State Agency Consultants

On November 18, 2015, state agency consultant Rannie Amiri, MD, evaluated Cheuvront's physical abilities based on a review of the medical record. (Tr. 231-34). Dr. Amiri found that Cheuvront could lift up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk for up to 4 hours, and sit for up to 6 hours in an 8-hour workday. (Tr. 231). He had limited ability to push and/or pull with his left leg. (Tr. 231). He could occasionally climb ramps/stairs, stoop, and craw; frequently kneel and crouch; never climb ladders/ropes/scaffolds/ and balance without limitation. (Tr. 231-32). He was to avoid all exposure to hazards, such as machinery and heights. (Tr. 232). Dr. Amiri opined that Cheuvront could perform sedentary work. (Tr. 234). On February 23, 2016, Leon Hughes, MD, concurred with Dr. Amiri's opinion. (Tr. 257-60).

### D. Relevant Testimonial Evidence

Cheuvront testified at the ALJ hearing. (Tr. 181-204). Cheuvront said that, on a typical day, he would clean the house or pick up, do laundry, cook, and occasionally nap in the afternoon while watching television. (Tr. 198-200). When he did laundry, he had to split his clothes up because a whole laundry basket would be too heavy. (Tr. 198). When he sliced items or opened cans, he had to keep them on a table for control/stability due to his hand tremors. (Tr. 192-93, 198). Cheuvront could sign his name with his dominant hand and could use buttons and

zippers; however, it took him "a little time." (Tr. 192-93, 203-04). He used social media on his phone, but he had to use both hands for stability. (Tr. 193-94). He also spent half an hour a day checking his chickens for eggs and feeding them, and he occasionally spent an entire day cleaning the chicken coup with rest breaks every 20 minutes. (Tr. 200-01). He also drove his truck to the store to get feed for his chickens and mowed his lawn, but he would occasionally have trouble driving due to his numbness and he occasionally forgot to check for gas or oil in his car and lawn mower. (Tr. 182-83, 197). Cheuvront attended church with his parents every Sunday and went to restaurants or the movies with friends once or twice a month. (Tr. 202).

Cheuvront said that he last worked as a barber in 2015, and that he had training from Akron Barber College and a license from the state of Ohio. (Tr. 182, 184). Before working as a barber, Cheuvront worked in a factory making fuel tube harnesses for trucks and as a scrapper at a recycling center. (Tr. 184-87). Cheuvront decided to go to barber school because the repetitive motion of bending over at his other jobs made his back hurt too much and caused numbness in his left side. (Tr. 188). Cheuvront owned his own barbershop for a while, but he had to stop cutting hair because his arms twitched, he started dropping tools, and he had to miss work for health issues. (Tr. 189-90).

Cheuvront said that his biggest problem was his pain, numbness, and tiredness, and that He said he'd had his arm tremor for three or four years by the time of the hearing, and that it was more or less noticeable based on his level of activity. (Tr. 190). He also had numbness in his legs and feet, which affected his ability to stand for long periods of time and required him to have a spot to rest when he was doing activities, like mowing his lawn. (Tr. 191, 195, 201). Cheuvront said that he could not sit all day because sitting too long made his back and left side numb. (Tr. 191). He said that his back problems and multiple sclerosis caused his strength to diminish, and that he felt tingling numbness in his hands and fingers when he tried to lift things.

(Tr. 192). His clubbed left foot bothered him when he stood too long. (Tr. 195). In addition to his physical symptoms, Cheuvront said that his multiple sclerosis caused him to be "very forgetful," have trouble learning, and have difficulty speaking clearly. (Tr. 194, 196).

Daniel Simone, a vocational expert ("VE"), also testified at the ALJ hearing. The ALJ asked the VE if a hypothetical individual with Cheuvront's experience, age, and education could work if he was:

> limited to a range of light work with the following additional limitations: frequent reaching overhead and in other directions with the right; frequent handling, fingering and feeling with the right; occasional ramps and stairs; no ladders, ropes or scaffolds. All the other postural would be occasional: balance, stoop, kneel, crouch and crawl. No unprotected heights and moving mechanical parts or operating a motor vehicle; and limited to performing simple, routine tasks.

(Tr. 205-06). The VE testified that such an individual could not perform Cheuvront's past work, but could work as a cashier II, furniture rental clerk or consultant, or sales attendant. (Tr. 206). The ALJ then asked the VE whether a hypothetical individual could work if he were limited to the sedentary level of exertion with the additional limitations described in the first hypothetical. (Tr. 207). The VE testified that such an individual could work as an order clerk, charge account clerk, or call-out operator. (Tr. 207). Finally, the ALJ asked if the individual from the original hypothetical could work if, instead of frequent handling, fingering and feeling with the right (dominant) hand, he was limited to occasional handling, fingering, and feeling with the right (dominant) hand. (Tr. 207-08). The VE said that all the jobs he identified, except furniture rental clerk or consultant, would be eliminated. (Tr. 208-09). The VE also testified that all work would be precluded if the individual would need more than a 2-minute a break every hour or would be off task more than 15 percent of the workday. (Tr. 209).

## IV. The Commissioner's Decision

Because the Appeals Council adopted the ALJ's decision in full and made additional findings on matters not discussed in the ALJ's decision, the court will review both decisions together as the final decision of the Commissioner. *See Taylor v. Comm'r of Soc. Sec.*, No. 95-3767, 1996 U.S. App. LEXIS 19125, at *11 n.2 (6th Cir., Jul. 16, 1996); (Tr. 4-8).

### A. The ALJ's Decision

The ALJ's November 8, 2017, decision found that Cheuvront was not disabled and denied his applications for DIB and SSI. (Tr. 20-28). The ALJ found that Cheuvront had not engaged in substantial gainful activity since June 27, 2015, and that he had the severe impairments of: "obesity, multiple sclerosis (MS), diabetes mellitus with neuropathy, ischemic heart disease, chronic kidney disease, degenerative disc disease, history of deep vein thrombosis, cerebral palsy, and club foot. (Tr. 22). The ALJ determined that Cheuvront did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments," and explained that:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. All of the listings were considered in reaching this finding. The claimant did not allege that the severity of any listed impairment was met, instead arguing he should be found unable to sustain full-time work at step five of the sequential evaluation process.

(Tr. 23). The ALJ also determined that Cheuvront had the residual functional capacity ("RFC") to perform sedentary work, except that:

> He is capable of frequently reaching overhead and in all directions with the (dominant) right upper extremity. He can handle, finger, and feel items frequently with the right upper extremity. The claimant can climb ramps and stairs occasionally, but can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can never work at unprotected heights, around moving mechanical parts, or operate a motor vehicle. He is limited to perform [*sic*] simple, routine tasks.

(Tr. 23).

In assessing Cheuvront's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the "objective medical evidence and other evidence based on the requirements of 20 C.F.R. 404.1592 and 416.929 and SSR 16-3p." (Tr. 23). The ALJ noted that, in assessing Cheuvront's alleged symptoms, he was required to:

> evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit claimant's functional limitations. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(Tr. 23). The ALJ explicitly discussed Cheuvront's written reports and hearing testimony, stating that:

> the claimant alleged disability as a result of multiple physical impairments. The claimant had a left clubbed foot since birth that limits his ability to stand and walk. In 1999, he had surgery for stenosis in his low back, symptoms improved and he returned to work. However, low back pain recurred in recent years. He has back pain and left sided numbness with extended sitting. The claimant has progressing MS and diabetic neuropathy that cause pain, numbness, and tremors in the hands and feet. In 2015, he stopped working as a barber because he dropped tools when his right (dominant) hand shook. He also had several absences leading up to the end of work in 2015. MS causes memory and concentration deficits. Symptoms increased after he ceased work.

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the reported severity is not consistent with daily activities and medical evidence.

> The claimant can drive short distances, sign his name and use an iPhone with social media applications despite numbness in his hands. He can sip and button, but it takes longer than it used to. He cares for chickens with some help from his family. He shops for feed, feeds the chickens, checks for eggs, rakes, and uses a wheel[barrow]. He attends church services weekly. He goes to restaurants and movie theaters with his friends once or twice per month. This wide array of daily activities is some evidence in support of the ability to perform work with the residual functional capacity I provided.

(Tr. 23-24). The ALJ then discussed the objective medical evidence, finding that treatment notes indicated that: (1) Cheuvront's symptoms were stabilized or improved through conservative

treatment, including medication, massage, and chiropractic therapy; (2) notwithstanding his impairments, Cheuvront generally maintained full strength in his dominant side, 3/5 to 5/5 strength in the other side, full sensation and reflexes, and an antalgic, but otherwise undisturbed, gait; and (3) he was able to participate in a regular walking program and was encouraged to engage in aerobic exercise.  (Tr. 24-25).  The ALJ also summarized the medical opinion evidence, which indicated that he could walk frequently or up to 4 hours in a workday, sit frequently or up to 6 hours in a workday, frequently lift/carry 10-32 pounds, and use hand/foot controls.  (Tr. 26).  Based on his evaluation of Cheuvront's testimony, the objective medical evidence, and the opinion evidence, the ALJ found that Cheuvront's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the totality of" the evidence in the record.  (Tr. 26).  Further, to the extent Cheuvront's alleged symptoms were consistent with other evidence, the ALJ found that they could be accommodated by limiting him to sedentary work with additional restrictions.  (Tr. 24-26).

The ALJ noted that, if Cheuvront were able "to perform the full range of sedentary work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 201.28."  (Tr. 27). However, because the ALJ found that Cheuvront was unable to perform all or substantially all of the requirements of sedentary work, the ALJ relied on the VE's testimony to determine whether Cheuvront could perform a significant number of jobs at the sedentary exertional level with additional limitations.  (Tr. 27).  Based on the VE's testimony and considering Cheuvront's RFC, age, education, and experience, the ALJ found that Cheuvront was "able to perform the requirements of representative sedentary and unskilled occupations such [as] order clerk, food and beverage, charge account clerk, and call out operator."  (Tr. 27) (citations omitted).  In light of his findings, the ALJ determined that Cheuvront was not disabled from June 27, 2015, through the date of his decision and denied Cheuvront's applications for DIB and SSI.  (Tr. 27-28).

**B.    The Appeals Council's Decision**

The Appeals Council's December 19, 2018, decision determined that Cheuvront was not disabled "through the date of the [ALJ's] decision" and denied his applications for DIB and SSI. (Tr. 4-8).  The Appeals Council first determined that all of Cheuvront's newly-submitted evidence – including his March 2018 MRI (Tr. 154-73) – was either immaterial or chronologically irrelevant to whether Cheuvront was disabled on or before November 8, 2017. (Tr. 4).  Upon review, the Appeals Council expressly adopted all of the ALJ's statements of law, findings of fact, and conclusions.  (Tr. 4-6).  The Appeals Council noted that the ALJ's decision did not discuss Cheuvront's "benign grade 1 schwannoma."  (Tr. 5).  Nevertheless, the Appeals Council found that Cheuvront's "benign grade 1 schwannoma" was not a severe impairment and did not impact the Appeals Council's decision to adopt the ALJ's findings.  (Tr. 5).  Specifically, the Appeals Council found that, although Cheuvront had temporary restrictions after his November 2016 surgery to remove the tumor, those restrictions were later lifted and physical examinations showed full motor strength, the absence of tremors/involuntary movements, normal gait, and intact range of motion.  (Tr. 5).

Just like the ALJ, the Appeals Council found that Cheuvront could perform sedentary work, except that:

> the claimant is capable of frequently reaching overhead and in all directions with the (dominant) right upper extremity; handling, fingering, and feeling frequently with the right upper extremity; climbing ramps and stairs occasionally, but can never climb ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; the claimant can never work at unprotected heights, around moving mechanical parts, or operate a motor vehicle; and he can perform simple, routine tasks.  In view of the above limitations, the claimant has the residual functional capacity to perform a reduced range of [work at] the sedentary exertional level.

(Tr. 6-7).  Based on its findings, and its review of the VE's testimony before the ALJ, the Appeals Council found that Cheuvront could work as an "order clerk, charge account clerk, and

call out operator."  (Tr. 7) (citations omitted).  Accordingly, the Appeals Council determined that Cheuvront was not disabled through the date of the ALJ's decision and denied Cheuvront's applications for DIB and SSI.  (Tr. 7-8).

## V.    Law & Analysis

### A.    Standard of Review

In Social Security cases, the court's review is limited to determining: (1) whether substantial evidence supported the Commissioner's final decision; and (2) whether the decision was made pursuant to proper legal standards.  42 U.S.C. § 405(g); 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  If the court answers "yes" to both questions, it must affirm the Commissioner's decision – even if the court might have decided the claim differently on its own.  *Cf. Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("[A] decision supported by substantial evidence must stand, . . . It is not our role to try the case *de novo*." (quotation omitted)).

"Substantial evidence" is *any evidence* that a reasonable person could believe is enough to back up the decision.  *See Biestek*, 880 F.3d at 783 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Rogers*, 486 F.3d at 241.  It does not require that *most* of the evidence in the record support the decision.  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) ("Substantial evidence is more than a scintilla of evidence but less than a preponderance.").  It also does not require the court to agree that the evidence relied upon was the most important or credible evidence in the record.  *Biestek*, 880 F.3d at 783 (noting that the court is not allowed to "resolve conflicts in evidence nor decide questions of credibility" (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)).  If the Commissioner's factual conclusions were reasonably drawn from the record, they are within the Commissioner's "zone of choice" and cannot be second-guessed by the court.  *Mullen v. Bowen*,

800 F.32d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Step Two: Severe Impairment Analysis – Grade 1 Schwannoma[3]

Cheuvront argues that the Appeals Council and ALJ erred at Step Two when they found that his benign grade 1 schwannoma was not a severe impairment. ECF Doc. 13 at 15; ECF Doc. 16 at 1. He asserts that, although he had the tumor removed in November 2016, a March 2018 MRI revealed that the tumor remained and had spread through his right neuro foramina into his right soft tissues. ECF Doc. 13 at 15.

The Commissioner responds that substantial evidence – including, *inter alia*, Dr. Bambakidis' 2017 note clearing Cheuvront to work – supported the Appeals Council's finding that his grade 1 schwannoma was not a severe impairment. ECF Doc. 15 at 10-12. The Commissioner argues that the March 2018 MRI does not support a different conclusion because: (1) Cheuvront does not challenge the Appeals Council's decision to disregard the MRI as chronologically irrelevant; and (2) Cheuvront's surgery was to remove *part* of the tumor, and the

---

[3] For the court's ease of analysis, the issues are presented in a different order than raised in Cheuvront's merits brief. Notably, under the first section of Cheuvront's argument – titled "Both the ALJ and the Appeals Council failed to properly evaluate the evidence by failing to consider the episodic nation [*sic*] of plaintiff's multiple sclerosis in combination with all his severe impairments" – Cheuvront challenges the Appeals Council's and ALJ's decisions at Steps Two (severe impairment), Three (listings), and Four (RFC). *See* ECF Doc. 13 at 14-18. The court addresses each of these challenges separately, in accordance with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs*, 459 F.3d at 642-43.

MRI actually showed no significant interval change from October 2017.  ECF Doc. 15 at 11-12.

Finally, the Commissioner asserts that an erroneous failure to find Cheuvront's grade 1

schwannoma severe would not justify a remand because the ALJ considered all of Cheuvront's

impairments and symptoms – severe or otherwise – in evaluating his RFC.  ECF Doc. 15 at 13.

At the second step of the sequential analysis, the Appeals Council considers whether the

claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).

A "severe impairment" is a medically determinable impairment that: (1) has more than a minimal

effect on an individual's ability to perform physical or mental work; and (2) is "expected to

result in death [or] to last for a continuous period of at least 12 months."  20 C.F.R. §§ 404.1509,

404.1522, 416.909, 416.922; *see Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691

(6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight

abnormality which has such a minimal effect on the individual that it would not be expected to

interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920

(11th Cir. 1984))).  If the claimant does not have a severe impairment, or combination of

impairments, the regulations direct the Appeals Council to find that the claimant is not disabled.

20 C.F.R. §§ 404.1520(c), 416.920(c).

Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'"

*Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of

Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  "After [the Appeals Council] makes a

finding of severity as to even one impairment, the [Appeals Council] 'must consider limitations

and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"

*Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)).  So long as

the Appeals Council considers all the claimant's impairments – severe and non-severe – in the

remaining steps of the disability determination, any error at Step Two is harmless.  *Nejat*, 359 F.

App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The Appeals Council applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Cheuvront's grade 1 schwannoma was not a severe impairment at Step Two. 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241. Because the Appeals Council determined that Cheuvront's grade 1 schwannoma did not cause, and was not expected to cause, a more than minimal effect on his ability to work for 12 months, the regulations directed a finding that it was not severe. 20 C.F.R. §§ 404.1509, 404.1522, 416.909, 416.922; *Salmi*, 744 F.2d at 691; (Tr. 5). Further, evidence in the record supported the Appeals Council's conclusion that Cheuvront's grade 1 schwannoma was not expected to affect his ability to perform physical or mental work for 12 months, including: (1) Dr. Bambakidis' January 5, 2017, statement that Cheuvront was "Ok to return to work and exercise;" (2) Nurse Suchan's January 6, 2017, recommendation for regular aerobic exercise; (3) post-surgical findings that Cheuvront had a normal gait, station, range of motion, and strength; and (4) Cheuvront's own post-surgical statements indicating that he was doing well and did not have back pain. (Tr. 999, 1004-05, 1013, 1017, 1051-52, 1054-55, 1059, 1070, 1112, 1164, 1166-67, 1206, 1208-09, 1239-40). Cheuvront's argument that substantial evidence does not support the Appeals Council's decision when a March 2018 MRI indicated that his grade 1 schwannoma was still present is unavailing because: (1) Cheuvront does not challenge the Appeals Council's conclusion that the March 2018 MRI was immaterial and not chronologically relevant; and (2) the continued presence of the grade 1 schwannoma was already reflected in the medical records that the Appeals Council considered. *See* ECF Doc. 13; ECF Doc. 16; (Tr. 5, 952, 955-56, 960-61, 997-99, 1002-05, 1037-40, 1044, 1051-52, 1054-62, 1095, 1163-67, 1193, 1208-09, 1227, 1229-31, 1236, 1239-40). Moreover, even if Cheuvront could show that the Appeals Council

erred in finding that his grade 1 schwannoma was not severe, that error would be harmless because the Appeals Council proceeded to consider all of Cheuvront's impairments in Steps Three through Five of the sequential analysis. *See Nejat*, 359 F. App'x at 576-77; (Tr. 5-8).

Because Appeals Council applied proper legal standards and reached a conclusion supported by substantial evidence in finding that Cheuvront's grade 1 schwannoma was not a severe impairment, the Appeals Council's non-severity finding must be affirmed.

### C.    Step Three: Listings Analysis

Cheuvront argues that the Appeals Council and ALJ did not adequately consider his memory problems, concentration/persistence/pace problems, social limitations, tremors, and other symptoms related to his multiple sclerosis diagnosis in determining whether the severity of his symptoms met or medically equaled Listing 11.09 (multiple sclerosis) or Listing 11.07 (cerebral palsy). ECF Doc. 13 at 16-17; ECF Doc. 16 at 1-2. Cheuvront also asserts that the ALJ did not adequately consider his obesity in combination with his other impairments, as required under SSR 02-1p. ECF Doc. 13 at 17.

The Commissioner responds that the ALJ adequately considered all of the listings and all of Cheuvront's symptoms in determining that he did not have an impairment or combination of impairments that met or medically equaled a listed impairment. ECF Doc. 15 at 14-17. The Commissioner argues that substantial evidence supported the ALJ's conclusion regarding the inapplicability of the Listings. ECF Doc. 15 at 14-15, 17. Further, the Commissioner asserts that Cheuvront has not: (1) pointed to any evidence supporting his claims that he met Listings 11.07 or 11.09; (2) argued that he had a marked physical functioning limitation that met 11.07(B) or 11.09(B); or (3) identified how his obesity impacted his other limitations. ECF Doc. 15 at 15-17. Moreover, the Commissioner asserts that the ALJ was not required to discuss any of the

listings identified in Cheuvront's merits brief because she did not raise them at the ALJ hearing or in any pre-hearing brief. ECF Doc. 15 at 14.

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v.*

*Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42).  "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing."  *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three."  *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Here, the ALJ – and Appeals Council by adopting the ALJ's decision – summarily stated that he considered all the listings and concluded that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment."  (Tr. 23).  Such a statement is not the kind of reasoned explanation that the Sixth Circuit contemplated in *Reynolds*.  424 F. App'x at 416.  Nevertheless, the ALJ's failure to provide an adequate explanation for his Step Three finding is not reversible legal error, because Cheuvront has not pointed to any evidence demonstrating that he reasonably could meet or equal every requirement of a Listing.  *Smith-Johnson*, 579 F. App'x at 432-33; *Sullivan*, 493 U.S. at 530; *Forrest*, 591 F. App'x at 366.  First, Cheuvront's conclusory references to Listing 11.09, Listing 11.07, and SSR 02-1p in his merits brief – articulating *some* criteria for the listings, but omitting specific references to record evidence that would support a finding that he met *all* the criteria – leave his argument undeveloped.[4]  *See* ECF Doc. 13 at 16-18.  Thus, any challenge that Cheuvront met or medically equaled those listings is arguably forfeited.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in perfunctory manner, unaccompanied by some

---

[4] Cheuvront's merits brief and reply brief are noticeably lacking in any argument that he met or equaled the criteria of Listing 1.04 (Spine Disorders), despite record evidence indicating that he had degenerative disc disease requiring at least one surgery, back pain, and a nerve sheath tumor that required surgery and radiation therapy.  *See generally* ECF Doc. 13; ECF Doc. 16.  Accordingly, any such argument is forfeit.  *McPherson*, 125 F.3d at 995-96.

effort at developed argumentation, are deemed [forfeited]. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Second, even if the court were to "put flesh on the bones" of Cheuvront's Listings argument, Cheuvront would not be able to demonstrate that he reasonably met or equaled every requirement of a Listing. *Smith-Johnson*, 579 F. App'x at 432-33; *Sullivan*, 493 U.S. at 530; *Forrest*, 591 F. App'x at 366. To meet the criteria for disability under Listings 11.07 (Cerebral Palsy) or 11.09 (Multiple Sclerosis), a claimant must show that his cerebral palsy or multiple sclerosis causes:

> A. Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; OR
>
> B. Marked limitation in physical functioning, and in one of the following:
> > 1. Understanding, remembering, or applying information; or
> > 2. Interacting with others; or
> > 3. Concentrating, persisting, or maintaining pace; or
> > 4. Adapting or managing oneself.

20 C.F.R. Pt. 404, Subpt. P, app. 1 §§ 11.07, 11.09. Additionally, a claimant may meet the criteria for disability under Listing 11.07 (Cerebral Palsy) by showing that his cerebral palsy causes "[s]ignificant interference in communication due to speech, hearing, or visual deficit." 20 C.F.R. Pt. 404, Subpt. P, app. 1 § 11.07(C). Further, although obesity is not a listed impairment, a claimant may show that he is disabled under the Listings when: (1) the effects of his obesity combine with his other impairments to equal the criteria for a listed impairment; or (2) his obesity was so severe that it "result[ed] in an inability to ambulate effectively . . . with the involvement of one major peripheral weight-bearing joint in listing 1.02(A)." *See* SSR 02-1p, 2002 SSR LEXIS 1, at *12-15; *see also* 20 C.F.R. Pt. 404, Subpt. P, app. 1 § 1.02(A) (identifying the weight-bearing joints as the "hip, knee, or ankle").

Here, the record evidence shows that Cheuvront could not reasonably prove that his cerebral palsy, multiple sclerosis, and obesity, singly or in combination, caused the extreme limitations in motor function described in Paragraph A of Listings 11.07 and 11.09, or the ambulatory limitations in Listing 1.02(A). 20 C.F.R. Pt. 404, Subpt. P, app. 1 §§ 1.02(A), 11.07(A), 11.09(A); SSR 02-1p, 2002 SSR LEXIS 1, at *12-15. Specifically, treatment notes, relevant opinions, and Cheuvront's own testimony, and/or statements to treatment providers indicated that: (1) Cheuvront maintained normal gait, station, posture, strength, and balance and he was able to perform aerobic exercise; (2) even when he had antalgic gait, he was still able to walk and had full range of motion; (3) he reported that he was active and walked regularly for exercise; (4) he often denied having back pain, weakness, or gait issues; and (5) he was able to continue doing household chores, including yardwork and caring for chickens. (Tr. 182-83, 192-94, 197-201, 231-34, 257-60, 472, 478, 483, 492-93, 495, 498-99, 502, 504, 506, 509, 513, 516, 519, 521, 541, 612, 614, 635, 651-54, 673-74, 677, 682, 686, 690, 710-11, 738, 741, 756, 762, 779, 799, 806, 809-10, 829, 861, 864, 973-79, 999, 1004-05, 1013, 1016-17, 1022, 1051-52, 1055, 1070, 1100, 1112, 1121, 1167, 1206, 1208-09, 1220-21, 1226, 1239). Further, record evidence would also undermine an argument that Cheuvront met Paragraph B mental function criteria, including: (1) notes indicating that Cheuvront had normal or adequate memory, concentration, and attentiveness; (2) Cheuvront's statements to treatment providers denying memory loss, confusion, and anxiety; and (3) Cheuvront's testimony that he was able to use social media, attend church once a week, and go to restaurants and movies with friends. 20 C.F.R. Pt. 404, Subpt. P, app. 1 § 11.07(B), 11.09(B); (Tr. 193-94, 202, 472, 478, 483, 540, 738, 768, 861, 924, 1004-05, 1055, 1105-06, 1167, 1220). Similarly, Cheuvront has not produced or pointed to any objective medical evidence or opinion evidence indicating that he had a significant hearing, speech, or visual defect, much less one that caused such "significant

interference in communication" that it would meet the Paragraph C criteria under Listing 11.07 (Cerebral Palsy). 20 C.F.R. Pt. 404, Subpt. P, app. 1 § 11.07(C). Even accepting that Cheuvront had intermittent periods during which his symptoms were exacerbated and required him to take breaks during activities, *see* (Tr. 556-57, 703, 710-11, 741, 751, 675, 689, 864), the evidence discussed above undermines any argument that his symptoms were so severe that he should have been found to be categorically disabled under one or more of the Listings.

Because Cheuvront has not met his burden to demonstrate that he reasonably could meet or equal every requirement of a Listing, the record does not raise a substantial question as to whether Cheuvront met a Listing and the ALJ's failure to explain adequately his Step Three determination is, at worst, harmless error. *Smith-Johnson*, 579 F. App'x at 432-33; *Sullivan*, 493 U.S. at 530; *Forrest*, 591 F. App'x at 366; *Sheeks*, 544 F. App'x at 641-42. Accordingly, the ALJ's and Appeals Council's conclusion that Cheuvront did not meet or medically equal a listed impairment must be affirmed.

### D. Step Four: Subjective Symptom Complaints

Cheuvront argues that, in evaluating his subjective symptom complaints, the ALJ "did not properly evaluate the medical evidence and make a defensible determination as to whether [Cheuvront's] testimony was credible." ECF Doc. 13 at 20; *see also* ECF Doc. 16 at 2 (reiterating that the ALJ misstated the evidence). Cheuvront asserts that substantial evidence did not support the ALJ's conclusion that the frequency and severity of his symptoms would not preclude full-time work, but instead showed that he was only "able to perform activities in short spurts followed by periods of rest." ECF Doc. 13 at 20-21. Cheuvront contends that the court should remand on this issue for ALJ to consider the "episodic nature" of multiple sclerosis. ECF Doc. 13 at 21.

The Commissioner responds that the ALJ properly and adequately considered Cheuvront's subjective symptom complaints in light of the medical and other evidence in the record. ECF Doc. 15 at 17-21. The Commissioner argues that the ALJ did not misstate or misrepresent Cheuvront's daily living activities, but accurately described them. ECF Doc. 15 at 19-21. The Commissioner contends that substantial evidence – including Cheuvront's conservative treatment history, lack of ambulatory aids, and daily activities – supported the ALJ's conclusion that Cheuvront's testimony regarding the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical evidence and his daily activities. ECF Doc. 15 at 17. Further, the Commissioner asserts that, to the extent Cheuvront's complaints were consistent with the other evidence in the record, the ALJ adequately controlled for Cheuvront's symptoms by restricting him to a range of sedentary work with limitations to his upper extremities, posture, hazard exposure, and simplicity/routineness of tasks. ECF Doc. 15 at 17-18.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any

other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).  While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Here, the ALJ complied with the regulations by clearly stating that he rejected Cheuvront's subjective complaints because they were inconsistent with the his daily activities and medical evidence, which showed that: (1) he could control his symptoms with medication, massages, and chiropractic therapy; (2) he maintained full strength and a generally undisturbed gait; and (3) he was able to walk regularly and was recommended to engage in aerobic exercise. *Felisky*, 35 F.3d at 1036; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 23-26).  Reading the ALJ's opinion as a whole and with common sense, the ALJ considered all the record evidence – including the intermittent periods during which

36

Cheuvront's symptoms flared up and his need for occasional breaks – and included limitations to Cheuvront's RFC to control for the symptoms that were consistent with the medical record. *Buckhannon*, 368 F. App'x at 678-79; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 24-26). Further, Cheuvront's argument that SSR 16-3p required the ALJ to make an explicit finding as to whether Cheuvront's testimony was *credible* is unavailing because SSR 16-3p specifically "*eliminat*[*ed*] the term 'credibility' from [the Social Security Administration's] sub-regulatory policy" and, in doing so, rejected any requirement that an ALJ must determine whether a claimant's testimony was *credible*. SSR 16-3p, 2016 SSR LEXIS 4 (providing that an ALJ must determine whether a claimant's testimony is *consistent with other evidence in the record*).

Substantial evidence also supported the ALJ's conclusion that Cheuvront's subjective complaints were not consistent with other evidence in the record. Although Cheuvront complained that he had difficulty standing and walking and hand/arm tremors that prevented him from performing sustained activities, evidence in the record contradicts that claim. Such evidence includes: (1) treatment notes indicating that Cheuvront could perform aerobic exercise and had normal gait, station, posture, strength, and balance; (2) Cheuvront's own statements that he was active, walked regularly for exercise, was still able to perform tasks with his hands despite his tremors (sometimes by using a table for support), and could perform household chores, including yardwork and caring for chickens; and (3) his own treatment statements denying back pain, weakness, or gait issues. (Tr. 182-83, 192-94, 197-201, 231-34, 257-60, 472, 478, 483, 492-93, 495, 498-99, 502, 504, 506, 509, 513, 516, 519, 521, 541, 612, 614, 635, 651-54, 673-74, 677, 682, 686, 690, 710-11, 738, 741, 756, 762, 779, 799, 806, 809-10, 829, 861, 864, 973-79, 999, 1004-05, 1013, 1016-17, 1022, 1051-52, 1055, 1070, 1100, 1112, 1121, 1167, 1206, 1208-09, 1220-21, 1226, 1239). Likewise, evidence contradicts Cheuvront's testimony

that he had memory issues, including treatment notes and statements by Cheuvront that he had normal memory, concentration, and attention. (Tr. 472, 478, 483, 540, 738, 768, 861, 924, 1055, 1105-06, 1167, 1220).

Because the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Cheuvront's subjective symptom complaints, the ALJ's and Appeals Council's decision to reject Cheuvront's subjective symptom complaints fell within the Commissioner's "zone of choice." 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *Biestek*, 880 F.3d at 783. According, the ALJ's and Appeals Council's decision to reject Cheuvront's subjective symptom complaints must be affirmed.

### E.      Step Four: RFC

Cheuvront argues that the Appeals Council and ALJ did not adequately consider his multiple sclerosis and diabetic neuropathy – specifically the numbness and tremors in his arms, hands, legs, and feet – in evaluating his RFC. ECF Doc. 13 at 15-16. He contends that the Appeals Council's and ALJ's failure to consider all of his multiple sclerosis and other symptoms resulted in a failure to build a logical bridge between the evidence and the result. ECF Doc. 13 at 17-18; ECF Doc. 16 at 2.

The Commissioner responds that the Appeals Council and ALJ adequately considered all of Cheuvront's impairments and symptoms – including his grade 1 schwannoma, multiple sclerosis, cerebral palsy, obesity, and tremors – in determining his RFC. ECF Doc. 15 at 13-16, 22-23. The Commissioner argues that the substantial evidence supported the Appeals Council's and ALJ's conclusion that Cheuvront could perform a range of sedentary work with additional limitations to account for his symptoms, and that Cheuvront has not indicated any additional limitations that should have been included in his RFC. ECF Doc. 15 at 13-14, 17, 23.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in evaluating Cheuvront's RFC. Here, the ALJ complied with the regulations by explicitly considering all of Cheuvront's impairments – severe or otherwise – in light of the objective medical evidence, medical opinions, and Cheuvront's own testimony regarding his symptoms. 20 C.F.R. §§ 404.1520(e), 404.1529(a), 416.920(e), 416.929(a); SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 23-26). The ALJ did not simply ignore Cheuvront's numbness, tremors, pain, and other symptoms related to his multiple sclerosis, diabetic neuropathy, cerebral palsy, obesity, and back problems, but carefully determined that his symptoms could be adequately accommodated by limiting him to sedentary work with additional postural, manipulation, environmental, and task restrictions. 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 23-26). Further, substantial evidence supported the ALJ's (and Appeals Council's) finding that Cheuvront could perform a reduced range of sedentary work, including: (1) treatment notes indicating that Cheuvront could perform aerobic exercise and had normal gait, station, posture, strength, and balance; (2) Cheuvront's own statements that he was active, walked regularly for exercise, was still able to perform tasks with his hands despite his tremors

(sometimes by using a table for support), and could perform household chores, including yardwork and caring for chickens; (3) his own treatment statements denying back pain, weakness, or gait issues and indicating that he felt well; (4) notes indicating that Cheuvront's various medical conditions were adequately controlled through conservative treatment, including medication, massage, chiropractic therapy, dieting, and exercise; and (5) opinions by Cheuvront's physical therapists and state agency consultants indicating that Cheuvront was able to perform physical tasks, including walking, standing, handling, fingering, reaching, and feeling. (Tr. 182-83, 192-94, 197-201, 231-34, 257-60, 472, 478, 483, 492-93, 495-96, 498-99, 501-02, 504-23, 541-44, 557, 560, 568, 612, 614, 620-22, 635, 651-54, 662-67, 673-74, 677, 682, 686, 688, 690, 710-11, 714, 722-32, 738, 741, 751, 756, 762, 767-68, 779, 788-90, 792-94, 799, 806, 809-11, 829, 847-48, 853, 855, 861, 864, 912-18, 922, 965, 973-79, 992, 995-96, 999, 1004-05, 1009-10, 1013, 1016-17, 1022, 1051-52, 1055, 1070, 1089-93, 1100, 1112, 1121, 1160-62, 1167, 1206, 1208-09, 1220-21, 1226, 1239). Thus, the ALJ's (and Appeals Council's) RFC determination was reasonably drawn from the record and the ALJ built an accurate and logical bridge between the evidence and the result. *Rogers*, 486 F.3d at 241; *Muller*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d at 877.

### F. Step Five: Disability Finding

Finally, Cheuvront argues that "the ALJ disregarded any objective or subjective evidence which would have resulted in a finding of disabled" at Step Five. ECF Doc. 13 at 22. Further, Cheuvront asserts that, because the ALJ's hypothetical question to the VE indicated that he was capable of performing at "the sedentary level of exertion," the Appeals Council erred when it found that he could perform "a reduced range of sedentary work" but did not take additional VE testimony. ECF Doc. 13 at 22; ECF Doc. 16 at 2-3. Finally, Cheuvront argues that the Appeals Council and ALJ erred in finding that he was able to perform work in the national economy

because the VE identified only one job – furniture rental clerk – which was classified as light level work. ECF Doc 13 at 22-23; ECF Doc. 16 at 3.

The Commissioner responds that the Appeals Council was permitted to rely on the VE's testimony in response to the ALJ's hypothetical question because the Appeals Council's and ALJ's RFC findings were consistent. ECF Doc. 15 at 22-24. Specifically, the Commissioner argues that the term "reduced range of sedentary work" merely meant that Cheuvront had more limitations – *i.e.*, the limitations described by the ALJ in his RFC finding – than those inherent in the base-level of sedentary work. ECF Doc. 15 at 23-24. Further, the Commissioner asserts that Cheuvront's argument that the VE found he could work only as a furniture rental clerk conflates: (1) the VE's response to the ALJ's third hypothetical, which included greater restrictions than those included in the ALJ's (and Appeals Council's) RFC finding; with (2) the VE's response to the ALJ's second hypothetical, which accurately reflected the ALJ's (and Appeals Council's) RFC finding. ECF Doc. 15 at 22.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal

quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ and Appeals Council applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Cheuvront was not disabled at Step Five. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241. Here, Cheuvront's argument that the Appeals Council was required to take additional VE testimony because its RFC finding differed from the ALJ's RFC finding is unavailing because the Appeals Council's statement that Cheuvront was able to perform a "reduced range" of sedentary work was *not* a finding that Cheuvront had more limitations than described in the ALJ's RFC finding. (Tr. 6-7.) As the Commissioner explains, "reduced range" is a commonly used term of art in social security cases. ECF Doc. 15 at 23-24. The alternative to a "reduced range" is a "full range," and these terms inform whether an adjudicator may rely on the medical-vocational guidelines alone or must also take testimony from a vocational expert. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d); 20 C.F.R. §§ 404.1569, 416.969. If Cheuvront were able to perform a *full* range of sedentary work, the medical-vocational guidelines would have directed a "not disabled" finding. *See* 20 C.F.R. Subpart P, App. 2 § 201.28 (directing a not disabled finding for any individual between the ages of 18 to 44 who can perform the full range of sedentary work and has a high school education). Further, because the ALJ and Appeals Council did not ultimately find that Cheuvront had the RFC to perform light work, but with only occasional handling, fingering, and

feeling bilaterally, the ALJ and Appeals Council were not bound by the VE's testimony that an individual with such an RFC could perform only one job. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 207-09). Instead, the ALJ and Appeals Council properly relied on the VE's response to a hypothetical question that accurately reflected the ALJ's and Appeals Council's ultimate RFC finding, the VE's testimony – that Cheuvront could work as an order clerk, charge account clerk, and call out operator. *Howard*, 276 F.3d at 238; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); (Tr. 6-7, 23, 27, 207). And the VE's testimony was substantial evidence supporting the Appeals Council's conclusion that Cheuvront was not disabled. *Howard*, 276 F.3d at 238; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); (Tr. 6-7). Thus, the Appeals Council properly concluded that Cheuvront was not disabled under the Social Security Act and denied his applications for DIB and SSI, and the court may not disturb that decision. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence at Steps Two, Four, and Five, and because any error at Step Three was forfeited or harmless, the Commissioner's final decision denying Cheuvront's applications for DIB and SSI is AFFIRMED.

**IT IS SO ORDERED.**

Dated: December 23, 2019

Thomas M. Parker
United States Magistrate Judge